UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| CENTER FOR FAMILY MEDICINE, a South Dakota Corporation, and the UNIVERSITY OF SOUTH DAKOTA SCHOOL OF MEDICINE RESIDENCY CORPORATION, a South Dakota Corporation, | ) ) ) ) ) ) ) | Civ.  05-4049-KES |
| Plaintiffs, | ) ) | ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT |
| vs. | ) ) | |
| UNITED STATES OF AMERICA | ) ) | |
| Defendant. | ) | |

Center for Family Medicine (CFM) and University of South Dakota

School of Medicine Residency Program (USDSMRP), plaintiffs, filed a

complaint seeking a refund of Federal Insurance Contributions Act[1] (FICA)

taxes.  Plaintiffs and defendant, United States of America, each cross move for

summary judgment.  For the reasons discussed below, the court grants in

part and denies in part plaintiffs' motions for summary judgment.

## BACKGROUND

Plaintiffs operate, or assist in the operation of, accredited medical

residency programs (collectively referred to as residency programs).  A medical

resident has received his or her medical degree and is obtaining further

---

[1] FICA taxes refer to taxes collected pursuant to the Federal Insurance Contributions Act.

medical training.  Plaintiffs provide their residents stipends as well as additional benefits.  Plaintiffs have withheld FICA contributions from the stipends they paid to their residents for the period relevant to this litigation.

At issue in this case are two separate residency programs.  Both residency programs are three-year programs which conform with the regulations of the Accreditation Council of Graduate Medical Education (ACGME).  University of South Dakota, School of Medicine Residency Corporation Statement of Undisputed Material Facts (USDSUMF) (Docket 120) ¶ 24, Center for Family Medicine Statement of Undisputed Material Facts (CFMSUMF) (Docket 144) ¶ 15.

The first program, the Internal Medicine Residency Program, has at all relevant times been sponsored by the University of South Dakota (USD) School of Medicine.[2]  USDSUMF ¶ 24.  The internal medicine program is run by four committees.  USDSUMF ¶ 28.  The Residency Education Committee ensures that the program remains in compliance with ACGME regulations. Id.  The Inservice Clinical Competence Committee reviews the performance of residents in the program and makes recommendations for resident promotion to the next resident year.  Id.  The Resident Recruitment Committee screens

---

[2]In the complaint, USDSMRC seeks a refund of FICA taxes paid for five medical residency programs.  For purposes of the motions before the court, however, the parties have agreed to focus their argument on the Internal Medicine Residency, which they agree is a fair representation of all of the residencies.  Docket 121 at 6.

applicants and makes recommendations regarding which applicants to accept into the program.  Id.  Finally, the Residency Review Committee serves as an appeal body for decisions of the Clinical Competence Committee among other review tasks.  Id.  All committees ultimately report to the Dean of the USD School of Medicine.  Id.

In addition to the four committees discussed above, the USD School of Medicine Residency Corporation (USDSMRC) is also affiliated with the internal medicine program.  USDSUMF ¶ 3, Govt. Response (Docket 170) at ¶ 3.  The USDSMRC, although incorporated separately from the Internal Medicine Residency Program, is governed in substantial part by persons who also work within the residency program, and its offices are housed within the USD School of Medicine administration building.  USDSUMF ¶ 2-8.  The USDSMRC is responsible for paying stipends to the medical residents in the internal medicine program and is the plaintiff in this action.

The second residency program at issue in this litigation is the Sioux Falls Family Medicine Residency Program.  The Family Medicine Residency Program is administered by CFM in conjunction with the USD School of Medicine.[3]  CFMSUMF ¶¶ 8, 11; U.S. Response (Docket 170) ¶ 8.  CFM is

---

[3]The United States contests CFM's control over the Family Medicine Residency Program and asserts that CFM works in conjunction with the USD School of Medicine.  For purposes of this order, the court does not find that distinction material.  The analysis regarding the status of the Family Medicine residents as employees of the residence program does not change if the USD

incorporated as a charitable, educational, and scientific corporation under SDCL 47-22.  CFMSUMF ¶ 11.  The Program Director of CFM has overall responsibility for the Family Medicine Residency Program.  SUMF ¶ 19. Additionally, the Residency Oversight Committee is responsible for curriculum development and resident education.  SUMF ¶ 20.  CFM pays stipends to the family medicine residents.  CFMSUMF ¶ 82.

Both residency programs recruit and select residents through the National Resident Matching Program.  USDSUMF ¶ 30, CFMSUMF ¶ 68. Through the Matching Program, potential residents submit relevant academic and personal credentials.  USDSUMF ¶ 30, CFMSUMF ¶ 67.  The residency programs interview potential residents and ultimately rank each resident. Docket 121 at ¶ 17, CFMSUMF ¶¶ 71-72.  The program director of the family medicine residency has the ultimate authority with regard to the ranking of applicants, but does receive input from the hospitals it contracts with regarding the acceptability of candidates.  CFMSUMF ¶¶ 70, 72.  Once medical residents are matched they sign a contract with the residency program.  USDSUMF ¶ 31, CFMSUMF ¶ 81.

---

School of Medicine is affiliated with CFM.  Further, CFM's status as a "school, college, or university" is not materially affected by that alleged relationship.  In fact, CFM's relationship with the USD School of Medicine arguably supports CFM's contention that it qualifies as an "establishment for teaching."  For purposes of this order, the court refers to faculty of the Family Medicine Residency Program as "CFM faculty."

The residency programs, although similar in many respects, have some differences.  Because the nature of each program is relevant to determine each program's tax liability, the court will examine the functional workings of each residency program separately.

### Operation of the Internal Medicine Residency

The Internal Medicine Residency Program requires 36 months of training, broken into certain required and elective rotations.  USDSUMF ¶ 34.  These rotations are performed at three hospitals that are contractually affiliated with the program, Avera McKennan Hospital, Sioux Valley Hospital, and the Royal C. Johnson Veteran's Administration Hospital, as well as other clinics located in South Dakota (referred to collectively as provider hospitals).  USDSUMF ¶ 53.  One of the missions of each of these provider hospitals is to provide education.  USDSUMF ¶ 54.  The provider hospitals receive funding for resident education through Medicare.  USDSUMF ¶ 56.  In turn, the provider hospitals compensate the residency programs for providing residents.  U.S. Statement of Undisputed Material Facts (Docket 152) ¶ 63.

Internal medicine residents may not work more than 80 hours per week, pursuant to ACGME regulations.  While at the provider hospitals, residents work under attending physicians, with the goal of attaining procedural competence.  USDSUMF ¶ 38.  Absent emergency situations, residents only see patients designated as teaching patients.  USDSUMF ¶ 40.

5

Although residents are responsible for the care of their patients, the attending physicians have the ultimate responsibility for patient care.  USDSUMF ¶ 42. The internal medicine program requires that residents be supervised only by physicians who have been appointed to a faculty position at USD School of Medicine, and are therefore faculty of the residency program.  USDSUMF ¶ 29.

In addition to patient care, internal medicine residents are also required to attend daily conferences and rounds designed to provide educational opportunities.  USDSUMF ¶ 39.  Residents are required to attend 60 percent of the scheduled lectures.  Id.  Internal medicine residents are evaluated by their attending physician after each round, and are given scores based on a standardized scale in a number of categories.  USDSUMF ¶ 46.  Residents take standardized written exams, in addition to other exams designed to measure the resident's progress.  Id.  Residents are also evaluated by nurses and patients.  Id.

Academic progress of the internal medicine residents is determined by the internal medicine program in addition to the chairperson of the responsible academic department at USD School of Medicine.  Additionally, the internal medicine program maintains disciplinary authority over its residents.  USDSUMF ¶ 47.  Internal medicine residents may file any grievances they have with USD.  USDSUMF ¶ 28.  After the successful

completion of the internal medicine residency, residents receive a certificate of completion which allows them to take the Internal Medicine Board examination and receive a license to practice medicine.  USDSUMF ¶ 50.

### *Operation of the Family Medicine Residency*

Like the Internal Medicine Residency Program, the Family Medicine Residency is a three-year program.  CFMSUMF ¶ 15.  All but five of the thirty-six month-long rotations are mandatory.  CFMSUMF ¶¶ 105-106.  The CFM residents manual sets forth what the resident will learn in each rotation, and most rotations have a required or recommended reading list.  CFMSUMF ¶ 110

Consistent with ACGME regulations, CFM established a clinic in Sioux Falls where the residents worked during part of their residency.  CFMSUMF ¶ 9.  This model office, known as the Family Practice Center, was required by the regulations to be within a certain proximity of a fully functioning hospital to allow for the "efficient functioning of the educational program."  CFMSUMF ¶ 53.

Pursuant to ACGME regulations, the CFM residents cannot work more than 80 hours per week.  CFMSUMF at ¶ 122.  As a part of the family medicine program, residents see patients at the Family Practice Center.  CFMSUMF ¶ 101.  Residents are part of a team that also consists of faculty and nurses.  CFMSUMF ¶ 102.  Residents work in tandem with CFM faculty

in evaluating patients and developing an acceptable treatment plan. CFMSUMF ¶ 103. Additionally, residents perform rounds with CFM faculty at the provider hospital. CFMSUMF ¶ 104. Family medicine residents are at all times required to be under the supervision of an attending physician, but as the residents progress through the training they are able to take on more responsibility without immediate supervision. CFMSUMF ¶ 89, U.S. Response (Docket 144) ¶ 89.

Family medicine residents are required to participate in activities beyond patient care. Each weekday, noon conferences are held and lectures and presentations are given to residents by CFM Faculty or residents. CFMSUMF ¶¶ 96-97. Residents are required to attend a minimum of 50 percent of these lectures. Additionally, residents are required to participate in Journal Club, a review of relevant scholarly literature. CFMSUMF ¶ 99. Other special conferences are also held throughout the course of the family medicine residency. CFMSUMF ¶ 100.

Family Medicine residents are evaluated throughout the course of the residency. CFMSUMF ¶ 124. Residents receive personal oral evaluations with regard to patient care, as well as collective examinations performed across the entire group of residents. CFMSUMF ¶¶ 126, 128. Annual evaluations, prior to progression in the residency program, are also conducted. CFMSUMF ¶ 129. After successfully completing the family medicine residency, residents

8

receive a Certificate of Completion, which allows the residents to sit for the family medicine board examination.  CFMSUMF ¶¶ 133, 134, 141.

Plaintiffs filed a complaint seeking a refund of FICA taxes paid on the stipends given to their residents for the taxable years ending December 31, 1995, through December 31, 2003.  (Docket 1).  Plaintiffs allege that the stipends are exempt from FICA taxes because their medical residents fit within the "student exception."  The United States contends that the "student exception" does not apply to the medical residents in this case.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56.  Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  Summary judgment is not appropriate if a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Id.

9

The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record.  Vette Co. v. Aetna Cas. & Sur. Co., 612 F.2d 1076, 1077 (8th Cir. 1980).  The nonmoving party may not, however, merely rest upon allegations or denials in its pleadings, but must set forth specific facts by affidavits or otherwise showing that a genuine issue exists.  Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691 (8th Cir. 2002).

## DISCUSSION

Social Security and Medicare are funded through the imposition of a tax on wages received as a result of "employment," pursuant to the FICA.  See 26 U.S.C. § 3101(a)-(b).  Employment is defined in 26 U.S.C. § 3121(b), but specifically does not include:

> service performed in the employ of –
>
> (A) a school, college, or university, or
>
> (B) an organization described in section 509(a)(3) if the organization is organized, and at all times thereafter is operated, exclusively for the benefit of, to perform the functions of, or to carry out the purposes of a school, college, or university and is operated, supervised, or controlled by or in connection with such school, college, or university, unless it is a school, college, or university of a State or a political subdivision thereof and the services

performed in its employ by a student referred to in section 218(c)(5) of the Social Security Act are covered under the agreement between the Commissioner of Social Security and such State entered into pursuant to section 218 of such Act;

if such service is performed by a student who is enrolled and regularly attending classes at such school, college, or university[.]

26 U.S.C. § 3121(b)(10).

Whether medical residents qualify for the "student exception" was first discussed by the Eighth Circuit in State of Minnesota v. Apfel, 151 F.3d 742 (8th Cir. 1998). Apfel dealt with whether medical residents were required to make social security contributions pursuant to an agreement by the state of Minnesota opting into the social security program for its state workers pursuant to 42 U.S.C. § 418(a)(1). The § 418 agreement entered into by Minnesota did not apply to "any service performed by a student." Id. at 744. The student exclusion at issue in Apfel is identical to the student exclusion at issue in this case, in that it applied "to service performed in the employ of a school, college, or university if such service is performed by a student who is enrolled and regularly attending classes at such school, college, or university." Id. at 747.

In an alternative holding, the court in Apfel found that the medical residents were not required to contribute to the Social Security Administration because they qualified for the student exclusion. Id. at 747-48. The court ultimately found that because "the primary purpose for the residents'

11

participation in the program is to pursue a course of study rather than earn a livelihood," they qualified for the student exception.  Id. at 748.

In a case nearly identical to the one before the court, a Minnesota district court found that medical residents qualified for the student exclusion to FICA, relying in part on Apfel.  United States v. Mayo Foundation for Medical Education & Research, 282 F. Supp. 2d 997 (D. Minn. 2003); see also Regents of the University of Minnesota v. United States of America, 2008 WL 906799 (D. Minn. 2008) (unpublished) (finding medical residents qualified for the "student exception" to FICA).  The court in Mayo examined the applicability of the "student exception" in a two-prong approach.  The court first examined whether the medical residents' employment met the statutory requirements of 26 U.S.C. § 3121(b)(10), namely that they were employed by a qualifying educational institution.[4]  See Mayo, 282 F. Supp. 2d at 1011-15.  The court then examined whether the residents qualified as "students."  Id. at 1015-20.

In examining whether the residents qualified as students, the court in Mayo first looked at the two factors set forth in 26 U.S.C. § 3121(b)(10), whether the residents were "enrolled" and "regularly attending classes."  Id. at

_____

[4]The United States concedes that the state of South Dakota excludes students from coverage under the § 418 agreement between it and the Social Security Administration.  See Docket 151 at 9, n.1.

12

1015-17.  The court then examined the residents' purposes for participating

in residency programs, noting the implementing regulation that provides:

> [T]he status of the employee as a student performing the services
> shall be determined on the basis of the relationship of such
> employee with the organization for which the services are
> performed.  An employee who performs services in the employ of a
> school, college, or university, as an incident to and for the
> purpose of pursuing a course of study at such school, college, or
> university has the status of a student in the performance of such
> services[.]

26 C.F.R. § 3121(b)(10)-2(c) (1995); see also Apfel, 151 F.3d at 747.

Particularly in light of the Eighth Circuit precedent in Apfel, the court

finds that the additional requirements that the work performed by the

residents be "incident to and for the purpose of pursuing a course of study"

must be considered by this court in determining whether the medical

residents in this case are "students."  See Mayo, 282 F. Supp. 2d at 1017-20.

## I.    Character of Residents' Employer

### A.    Employer-Employee Relationship

Pursuant to FICA, this court must look toward the "usual common law

rules" to determine who is the "employer" of the medical residents.  With

respect to this determination, 26 C.F.R. § 31.3121(d)(2) states:

> Generally such a relationship exists when the person for whom
> services are performed has the right to control and direct the
> individual who performs the services, not only as to the result to
> be accomplished by the work but also as to the details and means
> by which that result is accomplished.  That is, an employee is
> subject to the will and control of the employer not only as to what
> shall be done but how it shall be done.  In this connection, it is

not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so.  The right to discharge is also an important factor indicating that the person possessing that right is an employer.  Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services.

Plaintiffs argue that the residency programs are the employers of the medical residents at issue in this case.  The residency programs reviewed applications and ranked the residents for purposes of the match program.  Once selected, incoming residents entered into contracts directly with the residency programs.  The residency programs controlled the course of the residents' work through requiring the completion of specific rotations.  Further, the residency programs determined the residents' ability to advance and had the ability to discipline or ultimately discharge the residents.

The United States argues that because the provider hospitals have an ability to influence application selection, and retain control over the residents through the enforcement of hospital bylaws and rules, the provider hospitals are the residents' employers.  Docket 151 at 22.  The United States also argues that the provider hospitals are the residents' employers because they hosted the residents and because the residents served under the immediate control of physicians at those hospitals.  Finally, the United States argues that because the residents provided services beneficial to the provider hospitals, the provider hospitals were the employers.

14

Pursuant to the guidance set forth in 26 C.F.R. § 31.3121(d)(2), the court finds that the residency programs were the employers under the facts of this case.  Both residency programs in effect controlled the manner in which the residents performed under their contract and had the primary authority to discipline residents.  Additionally, both programs required that all physicians who supervised residents were members of the residency program faculty, which gave the residency programs direct control over the daily activities of the residents while they were at the provider hospitals.  The fact that the residents physically worked at the provider hospitals for part or all of their residencies is not dispositive.  See 26 C.F.R. 31.3121(d)(2).

The relationship between the residency programs and the provider hospitals is consistent with the residency programs' assertions that they work with the provider hospitals to fulfill the educational mission of the residency programs.  The fact that the provider hospitals may receive a benefit from the presence of the residents does not result in the residents being employed by those hospitals.  In this case, the residency programs are allowed access to the provider hospitals, wherein faculty physicians can work with the residents in a hands-on environment.  The residents help the hospital meet its educational mission and its goal of serving its patients.

To the extent the United States argues that the residents are in the employ of the provider hospitals because the hospitals provide funding to the

plaintiffs, the court disagrees.  It is undisputed that the provider hospitals receive funding from Medicare for the purpose of educating medical residents. The provider hospitals then contract with the residency programs to obtain those residents.  See, e.g., Docket 151, Att. 6. Nonetheless, under the affiliation agreements, the residency programs retain substantial control over the residents.  The residency programs' roles are in some ways analogous to sub-contractors, but that arrangement does not result in the provider hospitals being considered the legal employer of the residents.  Accordingly, the court finds that based upon the undisputed facts of this case, the residency programs are the employers of the medical residents.

**B.     Legal Status of the Residency Programs**

26 U.S.C. § 3121(b)(10) also requires that the employing entity be either a "school, college, or university" or a 509(a)(3) organization operated exclusively for the benefit of a school, college, or university.  Pursuant to 26 C.F.R. § 31.3121(b)(10)-2(d) the terms "school, college, or university" should "be taken in their commonly or generally accepted sense."

USDSMRC argues that it is a 509(a)(3) organization organized and operated exclusively for the benefit of a school, college, or university.  The United States does not dispute that USDSMRC qualifies as a 509(a)(3) organization.  The United States also concedes that the USDSMRC is "affiliated with and support[s] the residency programs of the University."

16

Response to USDSUMF ¶ 3, Docket 170.  The United States has presented no evidence to dispute USDSMRC's contention that it operates exclusively for the benefit of USD.  Accordingly, the court finds that there is no material dispute of fact that USDSMRC is a qualifying educational organization under 26 U.S.C. § 3121(b)(10).  Kraft Foods, Inc., 285 F.3d at 691.

CFM asserts that it is a "school, college, or university" under 26 U.S.C. § 3121(b)(10).  CFM points to the definition adopted by the court in Mayo, that a school is "[a]n establishment for teaching a particular skill or group of skills."  Mayo, 282 F. Supp. 2d at 1013 (quoting Webster's Third New Int'l Dictionary (1993)).  CFM argues that at its clinic, it works to ensure residents focus their time on educational tasks.  CFMSUMF 116.  CFM also argues that it oversees the residency program in an attempt to fulfill educational objectives, and is fully accredited for providing graduate medical education. See CFMSUMF 66, 107.  Accordingly, CFM argues it qualifies as an "establishment for teaching."

The United States argues that CFM is not a school because it is a "division and subsidiary of Sioux Valley Hospital and Avera McKennan Hospital."  Docket 167 at 18.  The United States therefore argues that this case is distinguishable from Mayo, because CFM is not part of a fully integrated unit that consists in part of a medical school.  The United States

17

further argues that because it asserts that the CFM residents added value to the clinic's patient care, CFM is not a school.  See Docket 167 at 18-23.

The court finds that CFM qualifies under the commonly understood definition of the word "school."  CFM is a non-profit, "charitable, educational, and scientific" corporation, whose purposes according to its articles of incorporation include "the recruiting and training and education of medical interns and residents and other allied health professionals."  CFMSUMF 11. A review of the undisputed facts indicates that CFM's work includes teaching its medical residents the skills required to practice in their chosen profession. The fact that CFM is affiliated with Sioux Valley Hospital and Avera McKennan, both nonprofit institutions, does not strip it of its educational mission.  The opportunity for medical residents to train in general hospitals is beneficial to their education and the relationship is entirely consistent with CFM's stated educational mission.  Further, CFM, like the hospital in Mayo, is affiliated with USD Medical School and works together with the medical school in providing the resident with education, which further supports its status as a school.  Accordingly, the court finds there is no material disputed fact with regard to CFM's status as a school under 26 U.S.C. § 3121(b)(10).

18

## II.    Residents' Status as Students

### A.    Enrolled

The residency programs assert that the medical residents were enrolled in their programs for purposes of 26 U.S.C. § 3121(b)(10).  The United States argues that the residents were not enrolled because unlike in <u>Mayo</u>, plaintiffs have not presented evidence of enrollment in a school system or evidence of school transcripts with letter grades.  Docket 167 at 7, Docket 169 at 8, <u>Mayo</u>, 282 F. Supp. 2d at 1004, 1015-16.

The United States argues that the contracts entered into by medical residents are not sufficient to constitute evidence of enrollment in the residency programs.  The contracts, however, are part of a substantial application process by medical resident candidates to enter the residency programs.  Resident candidates are required to submit their transcripts from medical school, along with academic records.  Further, once in their residency, the medical residents had a preset slate of required and elective courses necessary to complete the program.  Additionally, the residents were issued a USD identification card that identified them as a resident and the residents enjoyed student privileges such as USD library access. USDSUMF ¶ 51.  Although the residency programs at issue in this case did not go through the formal process of registering medical residents for credit hours or entering them into the system as "enrolled" students, the court finds the

19

distinctions between this case and the case in <u>Mayo</u> to be without substance.
Under the undisputed facts of this case, the court finds that the medical
residents were enrolled in the residency programs.

**B.      Regularly Attended Classes**

The residency programs assert that the medical residents regularly
attended classes pursuant to 26 U.S.C. § 3121(b)(10) when they attended the
noon conferences and when they participated in rounds and other patient
interaction at the direction of residency program faculty.  In <u>Mayo</u>, the court
found that the medical residents regularly attended classes when they were
involved in regularly scheduled conferences, grand rounds, and journal clubs.
282 F. Supp. 2d at 997.  Like in <u>Mayo</u>, the court finds that the residents
attendance at lectures, journal clubs, and other formal teaching settings,
demonstrates that the students "regularly attended classes."

The United States argues that because residents were not required to
attend all of the noon conferences (60 percent for the internal medicine
residents and 50 percent for the family practice residents) and because the
time in formal educational settings was substantially less than time spent by
the residents on patient care, the medical residents did not regularly attend
classes.  The United States argues that time spent out of formal settings, such
as under the supervision of faculty physicians while providing patient care,
cannot be included in the educational component of the residents' time

20

because the statute does not exclude "learning focused services."  Docket 151 at 12.  Accordingly, the United States argues "treating patients can never count as study."  Id.

The United States has not cited, and this court is unaware, of any authority that supports the contention that for purpose of § 3121(b)(10), the classes attended must consist of a certain percentage of a student's time. That factor is better dealt with in the context of the "purpose" of a student's decision to engage in service at the behest of the "school, college, or university."

Even assuming there is such a proportionality requirement, the court does not find that § 3121(b)(10) should be construed in the narrow manner advocated by the United States.  In its Statement of Undisputed Facts, the United States cites the testimony of Dr. Talley for the proposition that "[i]t is impossible to separate out patient care from any course of study."  United States Statement of Undisputed Facts (Docket 152) ¶ 98.  Dr. Talley's testimony is as follows:

> Q. [I]s it possible to split or separate out the patient services that the resident performed from their course of study?
>
> A. So separate what they're doing from their --
>
> Q. Learning
>
> A.  No, I think experiential learning is just that.  I mean, you're learning actually doing it and then reflecting . . .

The court finds that in addition to the traditional formal educational experiences, the residents' participation in patient care is also a part of their course of study during their residency.  Although residents may become able to act more independently through experience when working with patients, at all times patient care is the ultimate responsibility of the faculty physician supervising the residents.  Additionally, residents were regularly evaluated during the course of their patient interactions.  The United States's assertion that you cannot separate patient care from any course of study further supports this court's finding.  Accordingly, for this additional and independent reason, the court finds that residents regularly attended classes for purposes of 26 U.S.C. § 3121(b)(10).[5]

### C.  Residents' Purpose in Participating in Residency Programs

The United States argues that the residency programs were akin to an apprenticeship, clerkship, or other entry-level job training.  It is undisputed that completion of a medical residency is a prerequisite for medical graduates to sit for the board examination in their field of practice.  USDSUMF ¶ 50, CFMSUMF ¶ 141.  Further, without a certificate of completion from a residency program, a medical school graduate cannot be licensed to practice

---

[5]In its motion for summary judgment, the United States cites 2004 updates to the Treasury Regulations in support of its proportionality argument. See Docket 151, n. 6, 13-14.  These regulations, which apply only to services performed after April 1, 2005, are not relevant to the case before this court. 26 § 31.3121(b)(10)-2(c) (2004).

in South Dakota.  The United States argues that board certification is not required to practice internal medicine, but rather is just a "recognized quality marker" to demonstrate "exceptional expertise in a particular speciality to patients, other physicians, employing health care providers, hospitals that limit privileges to practice within its facilities, insurers, and the United States."  Docket 169 at 9.

Even assuming board certification is nothing more than window dressing, the undisputed fact remains that a resident cannot receive a medical license without a certificate of completion of a medical residency.[6] See Docket 169 at 12.  The United States's analogy between a legal clerkship and a medical residency fails for this reason.  Unlike a medical school graduate, a law school graduate can immediately sit for the bar examination after graduation from an accredited school, and may immediately begin the practice of law after passing that examination.

The United States argues that "[t]he necessary elements of a doctor's training can only be those elements common to all doctors, the entirety of which falls outside the residency program."  Docket 167 at 11.  The United States offers no authority for this position, and the court does not believe it

---

[6]The court notes that after one year, residents of the residency programs are able to obtain restricted licenses, which some of the residents use to "moonlight" at area medical facilities for pay.  The court does not find that this ability to moonlight in limited situations demonstrates that the residents' continuation of their residencies is not educational.

accurately represents the educational requirements of a doctor.  Although medical school provides an "undergraduate" medical education, that education does not prepare its graduates to practice in a medical specialty. The educational requirements of a brain surgeon and a family medicine practitioner are necessarily different.

With respect to the CFM residency, the United States contends that because the residents were required to address outstanding bills with patients, and further were made aware of the number of visits they conducted and the financial ramifications, the CFM residency was not educational in nature.  Docket 167 at 13-15.  CFM argues that this interaction with the residents regarding the financial side of family practice medicine was a part of the residents' practice management training.  Docket 171 at 6.  The residents compensation was in no way tied to the number of visits they conducted.  The court finds that the fact that family medicine residents were exposed to the finances of a family medicine practice does not alter the educational purpose of their choice to accept the residency.

Plaintiffs' contention that the medical residents entered the residency program for the primary purpose of education is further supported by the nature of the stipend received by the residents.  It is undisputed that the stipend was not tied to the number of days that the resident worked, or the number of hours the resident worked in a given week, but rather was set

entirely based upon the residents' progression in the residency program.  The United States points to a number of factors to suggest that the residents' schedule is unlike that of a typical school.  For example, the residents do not have uniform breaks and must clear their vacation time in advance.  As discussed above, however, the fact that the hospitals in some ways rely on the residents does not change the overall educational mission of the residency programs.

The United States provides no evidence for its assertion that residents applied to the residency programs for the purpose of obtaining long-term employment at one of the provider hospitals.  The nature of the match system, as well as the fact that the residents do not contract directly with any of the provider hospitals, cuts against this conclusion.  The simple fact that some residents ultimately take positions at the provider hospitals is not sufficient to create a material issue of fact with regard to the United States's assertions that the residents' purpose of becoming a resident is to work at those hospitals.

The United States's analogy between a medical residency and an apprenticeship or an entry-level job is accurate.  The medical residents are performing valuable on-the-job services, while receiving education on the proper way to perform those services.  The difference, however, is that both the USDSMRC and CFM qualify under the first prong of 26 U.S.C. § 3101 as

25

institutions that qualify as a school, college, or university, or exist solely to

support such an institution.  Congress has made the policy decision that work

done for these type of organizations, when performed by students with a

primarily educational purpose, is not subject to FICA taxation.  They are

therefore legally different from on-the-job training provided by a typical for-

profit business.  The court finds that under the undisputed facts of this case,

the medical residents obtained and performed their residencies for the

purpose of furthering their educations.

### D.      Performance of Services Incident to Course of Study

The United States argues that the sheer amount of medical services

provided by the medical residents precludes the residents from claiming

student status.  Plaintiffs do not dispute that the medical residents spend a

significant portion of their residencies working with and treating patients.

Plaintiffs assert that this hands-on interaction with the patients is a key part

of the medical education, and it occurs under the direction of residency

program faculty.  As stated in Mayo,

> The quality of a graduate medical education program depends
> directly on the breadth and quality of patient care pursued at the
> clinical institution.  Put another way, a substantial and diverse
> patient base, together with the pursuit of high quality care by
> staff and physicians and other members of the patient care team,
> is necessary for providing appropriate training to residents. . . .
> Because the objective of residency programs is ultimately to make
> physicians capable of caring for patients twenty-four hours a day
> and seven days a week, it is impossible to separate "education"
> from "patient care."  Thus, the principal classroom for residents

must be the clinical setting because patient care in a medical
specialty is what residents are receiving training for.

282 F. Supp. 2d 997 at 1014 (internal citations omitted).

Under the undisputed facts of this case, the court finds that the
purpose of the residency programs is to provide medical residents with an
education and ultimately with the ability to practice medicine.  The court
agrees with the court in <u>Mayo</u> that in a field such as medicine, education is
obtained through repeated interaction with patients in the residency programs
at issue in this case.  If the resident is performing well, those interactions will
necessarily be beneficial to the patients they interact with.  But the fact that
the residents confer a benefit to the hospitals through their residency does not
change the educational nature of that residency.  For these reasons, the court
rejects the United States's argument that the amount of time spent by
residents working with patients, or the value added by the residents to the
hospitals at which they work, somehow makes that work not incident to their
course of study in the residency.

## III.   Head Residents

With respect to the Internal Medicine residency program, the United
States argues that plaintiffs are not entitled to refunds for FICA taxes paid on
behalf of "chief residents."  Docket 169 at 10.  The United States asserts that
chief residents elected to stay on after the completion of the residency to help
administrate the residency programs.  Plaintiffs do not dispute the United

27

States's allegations, and allege no facts to controvert the United States's assertion that chief residents are essentially coordinators of the residency programs, not students.  Accordingly, plaintiffs' motions for summary judgment on the applicability of the student exception, with respect to head residents, is denied.

Based on the foregoing, it is hereby

ORDERED that plaintiffs' motions for summary judgment (Dockets 71 and 119) are granted in part and denied in part as set forth in this order.

IT IS FURTHER ORDERED that the United States's second motion for summary judgment (Docket 149) is denied.

IT IS FURTHER ORDERED that plaintiffs shall file with the court a computation of total damages by **August 18, 2008**.  Defendant shall file any objections to plaintiffs' computation by **August 26, 2008**.  The court will then enter judgment.

Dated August 6, 2008.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE

28